SOUTH PORTO RICO SUGAR COMPANY, peticionaria, *v.* JUNTA AZUCARERA DE P. R., demandada.

Número 11.
*Sometido:* 9 de noviembre de 1955. *Resuelto:* 30 de abril de 1956.

*James R. Beverley, R. Castro Fernández, José López Baralt* y
*Francisco Castro Amy,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la Junta recurrida.

El Juez Asociado Señor Marrero emitió la opinión del Tribunal.

En 20 de septiembre de 1954 la Junta Azucarera de Puerto Rico se dirigió por escrito a la South Porto Rico Sugar Company[1] notificándole que del examen por ella practicado resultaba que las ventas de las mieles producidas por aquélla en la zafra de 1952 a la Commercial Molasses Corporation y a la Commercial Solvents Corporation no habían sido hechas de acuerdo con la oferta y la demanda según lo dispone la Ley Azucarera de Puerto Rico, con excepción del contrato de abril 17 de 1952, mediante el cual la central vendió a la Commercial Solvents Corporation un millón de galones a razón de catorce centavos por galón; que del análisis llevado a cabo por la Junta a tenor de las disposiciones del art. 5 II($b$) de dicha ley resultaba un precio promedio para las mieles de todas las centrales de Puerto Rico para la zafra de ese año de $0.105540 por galón, mientras que el precio promedio de las ventas efectuadas por la South Porto Rico Sugar Company de dicho producto durante la referida zafra era de

---

[1] En lo sucesivo nos referiremos a la South Porto Rico Sugar Company simplemente como "la central" o como "la peticionaria."

$0.104110 por galón—en ambos casos en tanques de la factoría, excluyendo los arbitrios—lo que arrojaba una diferencia en precio promedio por galón para dicha zafra de $0.001430; y que en vista de ese resultado le ordenaba liquidara a los colonos la cantidad adicional de $5,531.11, en la proporción que a éstos correspondiera individualmente.

La central solicitó prontamente la reconsideración de esa orden. Luego de una vista, durante la cual la peticionaria ofreció prueba testifical y documental, en 6 de diciembre de 1954 la Junta declaró sin lugar dicha moción. En la resolución dictada al efecto llegó a las siguientes conclusiones de hechos:

"1. Que la producción de mieles pobres de la South Porto Rico Sugar Company de la zafra de 1952 fué de 5,860,484 galones según consta del informe sometido por dicha Central.

"2. Que casi la totalidad de las mieles producidas por dicha Central en esa zafra fueron vendidas en cuatro contratos formalizados en febrero, marzo y abril de 1952 y enero de 1953.

"3. Que el precio de oferta y demanda en el mercado libre de Puerto Rico para la fecha del contrato de dicha Central con la Commercial Solvents, marzo 24, 1952, fué de 17.547 centavos por galón como correctamente señala en su alegato el abogado de la Central, pero que el promedio general se obtuvo tomando como base el precio de 17.547 centavos y no el de 19.5 centavos por galón de esa venta como erróneamente se notificó en nuestra orden de 20 de septiembre de 1954.

"4. Que el precio a que la Central vendió a la Commercial Solvents Corporation en su contrato de marzo 24, 1952, por 815,282 galones de mieles fué de 15.569 centavos galón.

"5. Que en el contrato de febrero 28 de 1952 de dicha Central con la Commercial Molasses Corporation se vendieron 5,500,000 galones de mieles pobres, disponiendo el contrato que el precio se determinaría dividiendo la cantidad total de mieles vendidas en cuatro partes iguales en la forma siguiente:

"Un 25% se liquidará al precio promedio de las mieles pobres de Cuba vendidas por el Instituto de Estabilización de Azúcar de Cuba durante el trimestre de abril a junio de 1952; un 25% al precio promedio ponderado de cada uno de los dos restantes trimestres de 1952 y un 25% del precio promedio ponderado del

primer trimestre de 1953 de las ventas efectuadas por el Instituto de Estabilización de Cuba.

"6. Que la South Porto Rico Sugar Company informó por carta de 25 de mayo de 1954 que debido a las dificultades para obtener los precios exactos de las ventas de mieles cubanas vendidas trimestralmente se llegó a un acuerdo con la Commercial Molasses en cuanto a los precios a pagarse, pero tal información fué errónea porque de acuerdo con la evidencia sometida posteriormente en la vista por South Porto Rico Sugar Company según surge de los *Exhibits* 1 al 11, inclusive, las mieles de 1952 fueron vendidas de acuerdo con los términos de los contratos formalizados siguiendo los promedios ponderados de las ventas de Cuba durante los trimestres de abril a junio, julio a septiembre y octubre a diciembre de 1952 y el primer trimestre de 1953.

"7. Que el precio promedio de las ventas de mieles de todas las centrales de Puerto Rico en Puerto Rico y Nueva York fué de $0.105540 por galón en tanques de factoría para la zafra de 1952, excluyendo los arbitrios.

"8. Que el precio promedio de las ventas de mieles de la South Porto Rico Sugar Company para la zafra de 1952 fué de $0.104110 por galón tanque factoría excluyendo los arbitrios.

"9. Que la South Porto Rico Sugar Company vendió sus mieles de la zafra de 1952, a $0.001430 galón por debajo del precio promedio de las ventas de todas las centrales de Puerto Rico durante esa zafra."

La central acudió entonces ante nos, de conformidad con lo dispuesto por el art. 33 de la Ley Azucarera de Puerto Rico—núm. 426 de 13 de mayo de 1951, pág. 1139, 5 L.P.R.A. sec. 402.

Por resolución de 15 de diciembre del mismo año ordenamos a la peticionaria que elevara a este Tribunal dentro de los próximos 15 días copia certificada de los autos originales del caso. Así se ha hecho. La contención medular de la peticionaria es que del art. 5 II(*b*) de la Ley Azucarera "se desprende claramente...que una central viene obligada a liquidar a sus colonos la participación de éstos en las mieles, a base del precio promedio en el mercado de mieles determi-

nado por la Junta tomando en consideración las ventas de todas las centrales de Puerto Rico en el mercado local y el de Nueva York, *solamente cuando la central 'no ha vendido sus mieles como resultado de la oferta y demanda en el mercado libre, y por el contrario, ha vendido dichas mieles en forma tal y a entidades o personas tales que dicha venta haya redundado en un perjuicio injustificado para los colonos.'* Es decir, si la central ha vendido sus mieles como resultado de la oferta y demanda en el mercado libre, la Junta Azucarera carece de facultad para determinar y obligar a la central a liquidar al precio promedio en el mercado de mieles, no empece que dicho precio promedio resulte ser mayor que el precio a que vendió la central sus mieles." A esto replica la querellada que "desde el punto de vista de la Junta todo lo que el art. 5 II(*b*) dispone es darle facultad a la Junta para imponerle una sanción a la central cuando ésta haya vendido sus mieles a un precio más bajo que el precio de oferta y demanda en la fecha en que se hicieron esas ventas . . ." La cuestión se limita, pues, a un solo problema: la interpretación que debe darse al art. 5 II(*b*) tantas veces mencionado. Ese artículo en lo esencial dispone:

"II. Mieles Pobres (Agotadas) *(Blackstrap Molasses)*
". . . . . . . . . . . .

"(*b*) La Junta examinará las ventas de mieles de cada central durante el año, y si de dicho examen resultare y la Junta determinare que cualquier central no ha vendido sus mieles como resultado de la oferta y demanda en el mercado libre, y por el contrario, ha vendido dichas mieles en forma tal y a entidades o personas tales que dicha venta haya redundado en un perjuicio injustificado para los colonos, la Junta queda facultada para determinar el precio promedio en el mercado de mieles tomando en consideración las ventas de todas las centrales de Puerto Rico en el mercado local y el de Nueva York, y a base de ese precio promedio la central vendrá obligada a liquidar a los colonos la participación de éstos en dichas mieles." 5 L.P.R.A. sec. 374.

A nuestro juicio el contexto copiado es meridianamente claro. Según el mismo, incumbe a la Junta examinar las ventas de mieles de toda central durante cada año. Si a virtud de ese examen concluye que alguna central no ha vendido sus mieles de acuerdo con la oferta y la demanda en el mercado libre, *y que por el contrario,* ha efectuado las ventas en tal forma que han redundado *en un perjuicio injustificado para los colonos,* entonces—y sólo entonces—es que la Junta está facultada para determinar el precio promedio en el mercado de las mieles, tomando en consideración las ventas de ese producto realizadas por todas las centrales de Puerto Rico tanto en el mercado local como en el de Nueva York, y para ordenar que, a base de ese precio promedio, la central cumpla con la obligación de liquidar la participación de los colonos en sus mieles.

Los autos demuestran que la Junta examinó las ventas de mieles de la peticionaria, así como que determinó el precio promedio de ese producto durante dicho año, tomando en consideración las ventas efectuadas por todas las centrales de esta isla, tanto en el mercado local como en el de Nueva York. Sin embargo, de ellos no aparece en manera alguna que "por el contrario" la peticionaria hubiera vendido sus mieles "en forma tal y a entidades o personas tales" que sus ventas redundaran "en un perjuicio injustificado para los colonos." No habiéndose dado cumplimiento a este requisito *sine qua non* de la ley, la orden de la Junta no puede ser sostenida.

Conforme ya hemos indicado, al solicitarse por la South Porto Rico Sugar Company la reconsideración de la Orden de 20 de septiembre de 1954, la Junta señaló una vista, durante la cual la central adujo prueba testifical y documental. La testifical consistió en la declaración de Antonio Miró Sojo, quien declaró, entre otras cosas, que se dedica a la compraventa de mieles al por mayor y lleva unos 16 años en el negocio; que Puerto Rico en los últimos años se estaba guiando

por el precio de Cuba; que ha habido ocasiones en que Cuba vendió más barato a Inglaterra que lo que vendió a Estados Unidos, y Puerto Rico tiene que moverse en consideración a los precios y facilidades de embarque que haya aquí; que todo depende de la producción de mieles y de los barcos-tanques que pueden ser obtenidos para la transportación de la miel; que Cuba suministra como el 40 ó 45 por ciento de las mieles utilizadas en los Estados Unidos continentales; que la venta de mieles cubana en Estados Unidos es la que regula el precio; que en el negocio de mieles es costumbre vender a precio promedio del trimestre; que muchos están obligados a vender por falta de capacidad de almacenaje; que el precio de Cuba abarca todo el mercado, pero no lo establece con referencia a Puerto Rico debido a la discrepancia que hay en los fletes; que los compradores últimamente han adquirido las mieles de Puerto Rico basados en el precio de Cuba; y que el de mieles es un negocio incierto, especulativo, y él tuvo trescientos mil y pico de dólares de pérdida. La documental consistió, entre otros, en los contratos celebrados por la peticionaria con la Commercial Molasses Corporation y la Commercial Solvents Corporation en relación con las mieles aquí envueltas. También se estipuló que la peticionaria solamente tiene capacidad de almacenaje para aproximadamente la mitad de las mieles que anualmente produce. (²)

Ninguna prueba hubo ante la Junta para rebatir la ofrecida por la peticionaria. Es indiscutible que ante tal situación la evidencia aducida por ella debió ser merecedora de algún crédito. Véase *Villaronga, Com.* v. *Tribl. de Distrito*, 74 D.P.R. 331, 344, 345. Sin embargo, aparentemente no lo mereció.

---

(²) La querellada en su alegato admite que "en tiempos de paz...el mercado de mieles se convierte en un mercado de compradores y como Puerto Rico no tiene suficiente capacidad de almacenaje para almacenar su producción total de mieles, se hace necesario e imprescindible venderlas temprano en la zafra y de ahí que se aprovechen ciertos compradores de Estados Unidos para forzar precios bajos."

Sea ello como fuere, el art. 5 II(*b*) requiere, como ya hemos visto, que del examen efectuado por la Junta aparezca que la central no ha vendido sus mieles como resultado ·de la oferta y la demanda en el mercado libre, y por el contrario, que las ha vendido en forma tal que las ventas redundaron en un perjuicio injustificado para los colonos. Ese perjuicio injustificado brilló por su ausencia en este caso. El art. 5 II(*b*) usa en la frase "y por el contrario" la conjunción copulativa "y" y no la conjunción disyuntiva "o". De ahí que la necesidad de cumplir con ese requisito sea absoluta.

*Debe dejarse sin efecto la Orden dictada por la Junta querellada en 20 de septiembre de 1954, así como su resolución del 6 de diciembre del mismo año.*

El Juez Asociado Sr. Sifre no intervino.

El Juez Asociado Sr. Saldaña concurre en el resultado.